SLIP OPINION

Cite as 2014 Ark. App. 704

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV-14-207

CHRISTA GREGORY LOWDER and
ROBERT EDWARD LOWDER
APPELLANTS

V.

DAVID GREGORY
APPELLEE

**Opinion Delivered** December 10, 2014

APPEAL FROM THE CRAWFORD
COUNTY CIRCUIT COURT
[NO. 17DR-04-603]

HONORABLE MICHAEL MEDLOCK,
JUDGE

AFFIRMED

## LARRY D. VAUGHT, Judge

Appellants Christa Gregory Lowder and Robert Edward Lowder appeal from an order awarding custody of their biological children to Christa's former husband, appellee David Gregory. Appellants raise numerous assignments of error, none of which warrant reversal. We therefore affirm the custody order.

I. *Background*

Christa and David "Creed" Gregory were married in 1997, and two children were born during their marriage: a son, C1 in 2001, and a daughter, C2 in 2002. While married to Creed, Christa engaged in a long-term affair with appellant Robert Edward "Eddie" Lowder. In July 2004, she and Eddie underwent DNA testing, which revealed him to be the biological father of C1 and C2.

In October 2004, Christa sued Creed for divorce in the Crawford County Circuit Court. Her complaint recited that she and Creed were residents of Crawford County and that

there were "two children born of the marriage." She prayed for custody of the children, subject to Creed's visitation, and asked for child support. No mention was made of Eddie's being the children's biological father.

The circuit court entered a divorce decree on January 12, 2005, and awarded Christa custody of the "two children born of this marriage." Creed received standard visitation and was ordered to pay child support of $150 per month, plus all of the children's non-covered medical and dental expenses. Soon after the divorce, Christa married Eddie, and they moved with the children to Oklahoma.

In July 2005, Creed asked the court to place the children in his custody due to Christa and Eddie's interfering with his visitation and making derogatory remarks about him in the children's presence. In response, Eddie filed a motion to intervene, citing his status as the children's biological father. Both he and Christa asked the court to alter that portion of the divorce decree recognizing Creed as the children's father and to declare Eddie's paternity. Creed responded that he was the children's legal father and that Christa had misled both him and the court regarding the children's paternity.

On June 13, 2006, the court entered an order that allowed Eddie to intervene and established his paternity of C1 and C2. The order also vacated the divorce decree's finding that the children were born of Christa and Creed's marriage.[1] Despite these rulings, the court found Creed to be a person standing in loco parentis to the children and continued his

---

[1]The same order was re-entered on July 3, 2006, and similar findings were set forth in subsequent orders.

visitation and his child-support obligation.

Following the June 2006 order, the children lived with Christa and Eddie in Oklahoma and visited Creed in Arkansas. The parties continued to file motions for modification of visitation and custody, but there was little change in those arrangements until August 2011, when Creed filed a motion for custody of C1 and C2. The motion cited a material change of circumstances in that the children were living in "deplorable" conditions at Christa and Eddie's home and were subject to "physical abuse" while living there. The court heard the motion on July 2, 2012.

At the hearing, Creed testified that Eddie was verbally abusive to the children and had hit C1 on the back hard enough to leave a mark. He also said that the children had come to his home covered with flea or chigger bites and that Eddie had cursed at him and threatened him in front of the children. Creed's mother testified that Creed had taken good care of the children and that they were happy in his care. She said that she lived near Creed and kept the children overnight if Creed had to work, and that she would continue to do so if Creed obtained custody.

The children, ages eleven and nine, testified in a closed session, and their testimony was later sealed. They stated unequivocally that they would prefer to live with Creed rather than Christa and Eddie. C1 offered photographic evidence depicting Christa and Eddie's house as extremely cluttered, so much so that there was little space for walking around. He also produced a photograph of a large red mark on his back where Eddie had hit him. He said that he was afraid of Eddie and that Eddie hit him "a bunch." He also said that Eddie called him

3

"nasty" names and threatened him if he failed to testify that he wanted to live with Christa and Eddie. C1 further stated that there was not enough food or milk at Christa and Eddie's house and that Christa, who stayed at home during the day, had no vehicle or phone while Eddie was at work.

C2 likewise testified that Christa and Eddie's house was very messy and lacking in food and milk. She said that Eddie hit them and used bad language and that he told her how she should testify at the hearing. She stated that she got sick and nervous upon returning to Christa and Eddie's house after visiting Creed and that she liked being with Creed.

Christa testified that her house was clean, that she had sufficient groceries, and that she had never heard Eddie curse or yell at the children but only spank them once or twice. She explained the clutter in her house by saying that Creed ordered the children to be messy and disrespectful and threatened to kill their pets if they did not comply. She also said that she could borrow a neighbor's car if needed, which was confirmed by neighbor Joann Thode. Ms. Thode testified that she had never seen Eddie be extremely harsh with the children, nor had she ever seen the Lowder home in a "filthy" condition.

Eddie did not appear at the hearing because he had not been served with Creed's motion to change custody. He was aware of the hearing, however.

At the close of the evidence, the children's attorney ad litem recommended that the children be placed with Creed. The court continued the hearing until Eddie could appear and testify but entered a temporary order granting custody of the children to Creed, with Christa to receive visitation and to supervise all contact between the kids and Eddie.

Not long after the July 2 hearing, the ad litem moved for an immediate suspension of Christa and Eddie's visitation based on Eddie's threatening the children with corporal punishment and banishment to a foster home if they did not divulge their sealed testimony. The court temporarily suspended the children's visitation with Christa but soon restored it on the condition that Eddie not be present or communicate with the children.

On September 13, 2012, Eddie appeared before the court to offer his testimony. He denied that the children were uncomfortable with him and denied threatening the children or Creed. Christa also testified and denied the allegations in the ad litem's motion. She said that the children were fabricating stories because Creed was "working on" them. The children were not present, so the court again postponed a final custody ruling and instructed the ad litem to explore avenues for Eddie to visit the children at a neutral location.

A few weeks later, the children returned to court to offer more testimony. C1 again testified that he was afraid of Eddie because "he always hits us and he yells at us." He also said that, since his last court appearance, both Christa and Eddie asked him about his sealed testimony and that Eddie pushed him when he refused to tell what he had said. He further testified that Christa did not intervene on that occasion and that she made him and his sister write letters saying that they loved and missed Eddie. C2 testified in a similar fashion and also said that she had only a few items of ill-fitting clothing at her mother's house. Both children denied that Creed had asked them to mess up Christa and Eddie's house. Upon hearing this testimony, the court maintained temporary custody with Creed and visitation with Christa, and eventually allowed Eddie to visit the children at STEPS, a local community organization.

A final custody hearing was scheduled for May 2013.

Before the final hearing, the parties presented legal arguments concerning the court's jurisdiction and the viability of the June 2006 paternity order that had named Eddie as the children's father and vacated that part of the divorce decree establishing Creed's paternity. Creed argued that the June 2006 order was void because the divorce decree's finding of his parentage was res judicata and because the court's attempt to modify the divorce decree came too late under Arkansas Rule of Civil Procedure 60. Christa argued that the court lacked jurisdiction to change custody to Creed because, under the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA), the children's home state was Oklahoma. The court reserved a ruling on these issues.

At the final hearing on May 13, 2013, much of the testimony mirrored what was said at earlier hearings. However, some new and relevant evidence emerged. Christa and Eddie's Oklahoma neighbors, friends, and relatives testified that Christa and Eddie were good parents, that Eddie did not curse or mistreat the children, and that the family seemed normal. Two of the children's former Oklahoma teachers testified that they saw no sign of problems with the children. Further, a STEPS representative testified that the children were relaxed during their visits with Eddie but that Creed had made inappropriate comments about the visitation in the children's presence.

However, Amanda Epsy testified that she performed drug tests on the parties and that Eddie tested positive for marijuana. Deidre Underhill, who was C2's teacher in Alma (where Creed lived), said that C2 was anxious and even became sick in the classroom in the days

before she visited Christa and Eddie. Underhill also said that Creed was very active in the children's schooling but that she had never seen or spoken to Christa.

Rachel Steinbeck from the Western Arkansas Guidance Center testified that she observed Creed to be a concerned father who came to counseling sessions promptly and was forthcoming with information. She said that the family counseling sessions involving Creed and the children went "great" but that the sessions with Christa were characterized by the children's reluctance to speak for fear of saying something wrong. Steinbeck also said that Christa asked the children to leave the sessions within five or ten minutes. Steinbeck testified that she did not complete any family counseling with Eddie because the children made it obvious that they were afraid of him.[2] According to her, it was in the children's best interest to be in Creed's custody.

Creed testified that he received a series of vulgar and somewhat menacing text messages from Eddie after gaining temporary custody of the children in July 2012. One of the texts referred to Creed's female attorney as a "whore lawyer." Eddie testified and admitted to sending the texts. He also apologized to Creed's counsel and said that he meant to call her a "prostitute attorney." Eddie further admitted to making a Facebook post after the July 2 hearing that criticized the attorney ad litem and the court.

The children testified again, and, on this occasion, Christa and Eddie objected to leaving the courtroom while the children were on the stand. The children testified in open

---

[2]Eventually, all family sessions were suspended so that the children could feel free to express themselves.

SLIP OPINION

court and were cross-examined by Eddie, who was representing himself. They essentially stood by their prior testimony.

On August 6, 2013, the court entered an order granting custody of the children to Creed, with visitation to Christa and supervised visitation to Eddie. In doing so, the court referred to the July 2012 temporary order that changed custody to Creed based on the best interest of the children and certain material changes of circumstances, including the wishes of the children, excessive disciplinary measures, flea bites, transportation and telephone problems, and environmental issues at Christa and Eddie's home. The court also ruled that it had continuing jurisdiction under the UCCJEA and that the June 2006 paternity order naming Eddie as the children's father should be set aside. Finally, the court ordered Christa and Creed to each pay one-half of the attorney ad litem's fee. Christa and Eddie appeal and argue that the court erred in these and other rulings.

## II. *Voiding the June 2006 Paternity Order*

The August 6, 2013 custody decree, from which this appeal is taken, set aside the court's June 2006 order, which had vacated the divorce decree's recognition of Creed's paternity and declared Eddie to be the children's father. Christa and Eddie argue that the circuit court erred in setting aside the 2006 order. We address this issue first because the question of which man is the children's legal father will have an impact on many of the issues that follow.

The court set forth two distinct reasons for voiding the June 2006 order. First, the court ruled that the 2005 divorce decree was a final and permanent determination of Creed's

paternity under the doctrine of res judicata. Secondly, the court ruled that "at the very least, the Court lost jurisdiction of the paternity issue ninety (90) days after the entry of the Divorce Decree in January 2005" and that "any modification that might have been entered after that ninety (90) day period would be void and the Court would have no jurisdiction to enter such an Order." The court was clearly referring to Creed's argument under Arkansas Rule of Civil Procedure 60, which provides that, with certain exceptions, a court may modify or vacate a decree within ninety days of its having been filed. After that ninety-day period, the court loses jurisdiction to modify or vacate the decree. *See Stuart v. Stuart*, 2012 Ark. App. 458, 422 S.W.3d 147.

Christa and Eddie contend that the court erred in setting aside the decree, but their argument on appeal is directed to the court's finding that the divorce decree was res judicata on the issue of paternity. They do not attack the court's separate ruling that it lost jurisdiction to modify the divorce decree more than ninety days after the decree was entered. When a trial court makes independent, alternative rulings that are each dispositive of an appellant's claim and the appellant attacks only one of those rulings, the case will be affirmed without addressing either ruling. *Midyett v. Midyett*, 2013 Ark. App. 597. That is the situation before us. We therefore affirm this point without addressing the merits. Accordingly, the divorce decree's declaration of Creed's paternity stands.

III. *Jurisdiction Under the UCCJEA*

When the circuit court entered the temporary order granting custody of the children to Creed in July 2012, the children had been living in Oklahoma with Christa and Eddie for

9

seven years and exercising their visitation with Creed in Arkansas. Christa and Eddie argue that the circuit court lacked subject-matter jurisdiction under the UCCJEA to change custody to Creed in July 2012 or thereafter because the children's home state was Oklahoma.[3]

The UCCJEA, codified at Arkansas Code Annotated sections 9-19-101 to -401 (Repl. 2009), provides the exclusive method for determining the proper state for jurisdictional purposes in child-custody proceedings that involve other jurisdictions. *Harris v. Harris*, 2010 Ark. App. 160, 379 S.W.3d 8. We review rulings under the UCCJEA de novo, although we will not reverse a circuit court's findings of fact unless they are clearly erroneous. *Piccioni v. Piccioni*, 2011 Ark. App. 177, 378 S.W.3d 838. A trial court has the discretion to decide whether to decline to exercise jurisdiction, and we will not reverse the court's decision absent an abuse of discretion. *Id.*, 378 S.W.3d 838.

We begin our analysis by recognizing that the Crawford County Circuit Court unquestionably had jurisdiction to make the initial child-custody determination, which occurred during the 2004–05 divorce proceeding. A court may make an initial child-custody determination if, among other things, it sits in the child's home state on the date the custody proceeding is commenced. Ark. Code Ann. § 9-19-201(a)(1) (Repl. 2009). There is no dispute that Christa, Creed, and the children lived in the State of Arkansas in the months before the divorce/custody complaint was filed. The Arkansas court therefore had the

---

[3]Appellants initially argue that the court erred in ruling that Christa raised her issues under the UCCJEA too late in the proceedings. Appellants are correct in this regard. The UCCJEA involves subject-matter jurisdiction, which may be raised at any time. *See Adams v. Adams*, 2014 Ark. App. 67, 432 S.W.3d 49. However, because the court went on to address the merits of the jurisdictional issue, we see no reversible error.

SLIP OPINION

authority to make the initial child-custody determination under section 9-19-201. *See West*

*v. West*, 364 Ark. 73, 216 S.W.3d 557 (2005).

Having decided that the Arkansas court had jurisdiction to make the initial child-custody determination, we must next consider whether the court had continuing jurisdiction to enter subsequent custody orders. With exceptions not applicable here, a court that has made an initial child-custody determination consistent with section 9-19-201 has continuing, exclusive jurisdiction over the determination until:

(1) a court of this state determines that neither the child, nor the child and one (1) parent, nor the child and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships; or

(2) a court of this state or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this state.

Ark. Code Ann. § 9-19-202(a) (Repl. 2009).

Under subsection (a)(1), quoted above, an Arkansas court may continue its jurisdiction if the children have a significant connection with this state. *West*, 364 Ark. 73, 216 S.W.3d 557; *Hatfield v. Miller*, 2009 Ark. App. 832, 373 S.W.3d 366. Here, the children have maintained significant Arkansas connections during the case. Before entry of the temporary-custody order, they came to Arkansas for court-ordered visitation with Creed. They had their own rooms at Creed's house, had pets there, had friends over, and had a relationship with their Arkansas grandmother and uncle, with whom they occasionally spent the night. Additionally, the children's father, Creed, maintained significant connections with Arkansas, having lived and worked here over the course of this case. These connections justify the

Arkansas court's continuing jurisdiction, and the court did not abuse its discretion in exercising that jurisdiction. *See Thomas v. Avant*, 370 Ark. 377, 260 S.W.3d 266 (2007); *West*, 364 Ark. 73, 216 S.W.3d 557; *Hatfield*, 2009 Ark. App. 832, 373 S.W.3d 366.[4] Moreover, even though the children lived in Oklahoma for a lengthy period, we have recognized that "continuing jurisdiction" is favored over "home-state" jurisdiction. *Thomas*, 370 Ark. at 382–83, 260 S.W.3d at 270–71 (citing the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A (2003)).

Christa and Eddie argue alternatively that the trial court should have declined to exercise jurisdiction because Arkansas was an inconvenient forum, given that key witnesses and records were in Oklahoma. A court may refuse jurisdiction under the UCCJEA if it considers itself an inconvenient forum and finds that another state is the more appropriate forum. Ark. Code Ann. § 9-19-207 (Repl. 2009). However, if a court chooses to retain jurisdiction, we will not reverse that decision absent an abuse of discretion. *Harris*, 2010 Ark. App. 160, 379 S.W.3d 8.

The evidence shows that Christa and Eddie were able to produce witnesses and records in their favor at the Arkansas hearing. Further, by the time of the final hearing in May 2013, the children had been in Creed's custody in Arkansas for almost a year and had attended school here, making many Arkansas records and witnesses relevant as well. Additionally, the Arkansas court was familiar with the long and complicated history of this case. We therefore

---

[4]Appellants cite *Czupil v. Jernigan*, 103 Ark. App. 132, 286 S.W.3d 753 (2008), but that case is inapposite because, among other reasons, the child there had never been to Arkansas at the time of the initial custody ruling.

SLIP OPINION

see no abuse of discretion in the court's continuing its jurisdiction.[5]

### IV. *Hearings and Evidence*

As previously mentioned, the parties filed numerous motions during this case. Christa and Eddie argue that the circuit court erred by not holding a hearing on all of their motions. We disagree.

Arkansas Rule of Civil Procedure 78(c) (2014) provides that a circuit court "may" hold a hearing on a motion. The word "may" is generally permissive rather than mandatory, *see Wye Comm. Club, Inc. v. Harmon*, 26 Ark. App. 247, 764 S.W.2d 55 (1989), so a motion hearing is discretionary with the court. David Newbern, John J. Watkins, & D.P. Marshall Jr., *Ark. Civ. Prac. & Proc.* §§ 13:4 & 20:5 (5th ed. 2010). Furthermore, Christa and Eddie have not explained how they were prejudiced by the lack of a hearing on any particular motion. We will not reverse in the absence of a showing of prejudice. *See Peters v. Pierce*, 314 Ark. 8, 858 S.W.2d 680 (1993).

Christa also argues that she was not allowed to present additional evidence at the final hearing on May 6, 2013. However, she does not explain what particular proof she was prohibited from admitting into evidence or how she was prejudiced by its exclusion. It is the appellant's burden to demonstrate and explain reversible error. *Tri-Eagle Enters. v. Regions Bank*, 2010 Ark. App. 64, 373 S.W.3d 399. That has not been done here.

---

[5] Because we have affirmed the circuit court's decision to set aside the June 2006 order, thereby reinstating Creed's paternity, we need not address Christa and Eddie's arguments that Creed does not meet the definition of a "person acting as a parent" under the UCCJEA or that the June 2006 order affected the court's jurisdiction under the UCCJEA.

Eddie also makes a brief argument that the circuit court should not have held the July 2012 hearing without him being present. We see no reversible error because the court continued the hearing to allow Eddie to testify. We therefore affirm on this point.

V. *Custody Award to Creed*

Christa and Eddie present two arguments on this issue. First, they assert that the circuit court erred by depriving them of custody of their children without first finding them to be unfit parents.

As a general rule, there must be a finding of the natural parents' unfitness before custody can be granted to a third party. *Meadough v. Bulliner*, 2009 Ark. App. 263. Here, the circuit court did not find Christa and Eddie unfit. However, no such finding was necessary. Once the June 2006 order was set aside and Creed was again the children's legal father, this case became a custody battle between Creed and Christa as parents. Between parents, a showing of unfitness is not necessary to warrant a change of custody. *Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 388 (2002).

Next, Christa and Eddie argue that granting custody of the children to Creed was not in the children's best interest and that Creed failed to prove a material change in circumstances that would justify a change of custody.

In reviewing child-custody cases, we consider the evidence de novo but will not reverse a trial court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *McCoy v. Kincade*, 2014 Ark. App. 664, ___ S.W.3d ___. We give due deference to the superior position of the trial court to view and judge the credibility

SLIP OPINION

of the witnesses. *Id.*, ___ S.W.3d ___. This deference is even greater in cases involving child custody, as a heavier burden is placed on the trial court to use the fullest extent of its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.*, ___ S.W.3d ___.

In order to change child custody, the trial court must first determine that a material change of circumstances has occurred since the last order of custody; if that threshold requirement is met, the court must then determine who should have custody with the sole consideration being the best interest of the child. *Evans v. McKinney*, 2014 Ark. App. 440, 440 S.W.3d 357.

We have no hesitancy in holding that the circuit court did not clearly err in changing custody to Creed. First, the evidence showed that a material change of circumstances occurred. After entry of the last custody order in the case (which, according to Christa and Eddie, occurred in 2007), Creed saw photographic evidence that Eddie had hit C1 on the back hard enough to leave a mark. Creed also had to treat the children several times for flea bites when they arrived for visitation. Moreover, the children, who were older and necessarily more articulate and aware of their circumstances than they had been in 2007, expressed a clearly defined preference to live with Creed. *See generally Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999). The cumulative effect of these matters was sufficient to constitute a material change of circumstances.

The children's testimony also supports the court's finding that changing custody to Creed was in their best interest. It was proper for the court to consider the children's

preference to live with Creed. Ark. Code Ann. § 9-13-101(a)(1)(A)(ii) (Repl. 2009 & Supp. 2013). Additionally, their testimony of physical and verbal abuse, coercion, and lack of food in their mother's home was deemed credible by the court:

> The Court, as evidenced by numerous academic awards, believes the children in this matter are credible, very smart, intelligent young people. There is no evidence before the Court to indicate that they could or would be brainwashed, coerced, or threatened into testifying a certain way or relating facts that were untrue.

The court also noted that it had the benefit of the ad litem's recommendation and investigation in determining the children's best interest. On these facts, and the evidence in its entirety as set forth in the hearings, we affirm the court's custody ruling.

## VI. *Ad Litem's Fees*

Christa argues that the court erred in requiring her to pay part of the attorney ad litem's fee. A circuit judge may appoint an attorney ad litem if it will facilitate a custody case and protect the rights of the child. Ark. Code Ann. § 9-13-101(e)(2) (Supp. 2013). The ad litem's fees and reimbursable expenses shall be paid by the Administrative Office of the Courts (AOC) from funds appropriated for that purpose. Ark. Code Ann. § 9-13-101(e)(4) (Supp. 2013). The court is required to send a copy of its fee order to the AOC. Ark. Code Ann. § 9-13-101(e)(5)(A) (Supp. 2013). The court may also require the parties to pay all or a portion of the ad litem expenses depending on their ability to pay. Ark. Code Ann. § 9-13-101(e)(5)(B) (Supp. 2013).

In this case, the court ordered the AOC to pay some of the ad litem's fee. The AOC apparently paid $1250, and Creed paid part of the fees as well. It appears that Christa has paid nothing.

Christa argues first that the court should have transmitted the fee order to the AOC rather than relying on the attorney ad litem to "handle that part of the process." While it is not clear exactly how the AOC received the order, it obviously did receive it and made payment on it. Christa does not explain how she was prejudiced by the fee order's mode of transmittal. She also argues that she cannot afford the fees. However, she makes no specific, convincing argument of her inability to pay. Again, it is the appellant's burden to demonstrate and explain reversible error, and that was not done in this instance. *Tri-Eagle Enters.*, *supra*.

VII. *Conclusion*

For the reasons set forth in this opinion, we affirm the order entered by the Crawford County Circuit Court.

Affirmed.

GLADWIN, C.J., and WALMSLEY, J., agree.

*Booth Law Firm, P.L.C.*, by: *Frank W. Booth*, for appellants.

*The Baker Law Firm*, by: *Rinda Baker*, for appellee.